Richard L. GIBSON, Appellee,

v.

MOHAWK RUBBER COMPANY,
Appellant.

Richard L. GIBSON, Appellant,

v.

MOHAWK RUBBER COMPANY,
Appellee.

Nos. 81–2035, 81–2084.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 27, 1982.

Decided Dec. 15, 1982.

Harley M. Kastner, Millisor, Belkin & Nobil, Akron, Ohio, James M. Moody, Wright, Lindsey & Jennings, Little Rock, Ark., for appellant-cross appellee.

William Russell Gibson, Pettus, Johnson & Gibson, Fayetteville, Ark., Millisor, Belkin & Nobil, Akron, Ohio, for appellee-cross appellant.

Before HEANEY, Circuit Judge, and STEPHENSON,* and HENLEY, Senior Circuit Judges.

HEANEY, Circuit Judge.

Mohawk Rubber Company appeals from the district court's[1] judgment, 521 F.Supp. 1285 (E.D.Ark.1981), awarding Richard Gibson $194,376.74 in damages because the company discharged him in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* Gibson cross-appeals from the district court's denial of his request for certain equitable relief. We reverse and remand for a new trial to determine the damages to which Gibson is appropriately entitled.

## I.

### FACTS.

Mohawk Rubber Company, headquartered in Hudson, Ohio, is primarily a producer of tire and rubber products. Prior to 1979, Mohawk operated tire producing facilities in Akron, Ohio; West Helena, Arkansas; and Salem, Virginia. Today, only its Salem plant remains in operation.

Richard Gibson began working for Mohawk in 1959 as a production manager at the company's West Helena facility. In 1960, Gibson accepted a position with a competing rubber products company, but he returned to Mohawk in 1963 as a division manager at the West Helena plant. In 1967, Gibson was promoted to production manager, and transferred to Mohawk's new facility in Salem, Virginia. At the Salem plant, Gibson helped supervise the installation of equipment, and the hiring and training of over 300 new employees. Within a year after its opening, the Salem plant became one of the most successful tire-producing facilities in the country.

Mohawk transferred Gibson back to its West Helena plant in 1970, and promoted him to general manager of that facility. The West Helena plant had been beset with labor and production problems, and Mohawk had employed seven general managers at the facility in the previous ten years.

During Gibson's tenure as general manager at the West Helena plant, production increased regularly. In both 1976 and 1977, the West Helena plant produced more tires than in any other years in its sixty-five year history. The record is unclear as to how much profit Mohawk realized from the production at the West Helena plant while Gibson was its general manager, but is undisputed that Gibson received substantial pay raises in 1970, 1971, 1972, 1975 and 1977. He also received bonuses in every year that he was a general manager.

On March 23, 1978, when Gibson was fifty-four years old, Mohawk fired him. Mohawk paid Gibson full wages through August, 1978, and kept him on a leave of absence until he reached age fifty-five in February, 1979. Because Mohawk kept Gibson on this leave of absence, he retained his health insurance coverage and became eligible for early retirement at age fifty-five. Gibson declined to accept early retirement.

Mohawk contends that it fired Gibson because he had a poor working relationship with his superior, David King, and because he had made excessive concessions to the West Helena employees. In contrast, several union members employed at the West Helena plant who spoke with King immediately after Gibson was discharged testified that King told them, in essence, that Mo-

---

* The Honorable ROY L. STEPHENSON, Senior Circuit Judge, now deceased, sat with the panel, participated in the conference and agreed to the disposition reflected in this opinion.

1. The Honorable Oren Harris, United States Senior District Judge for the Eastern District of Arkansas.

hawk had a policy of discharging employees approaching age fifty-five, and that Gibson was fired for this reason.

On July 9, 1979, Mohawk permanently closed its West Helena plant because the facility was operating at a deficit. Mohawk let Gibson's replacement, Tom Ferrell, go at the end of that month without offering Ferrell another position within any of its other operations.

Gibson filed this action under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.*, in August, 1978. In a jury trial in June, 1981, the jury found that Mohawk unlawfully discharged Gibson because of his age. It awarded him $97,188.27 in actual damages from the date of his discharge to the date of trial. The jury also found that Mohawk terminated Gibson in willful violation of the ADEA, and awarded Gibson an additional $97,188.27 in liquidated damages.

In the subsequent nonjury hearing on Gibson's request for equitable relief, the district court ordered Mohawk to contribute the funds it would have owed to Gibson's pension plan between the date of his discharge and February, 1979, when he reached age fifty-five and became eligible for early retirement and his pension fully vested. The district court, however, refused to order Mohawk to reinstate Gibson or to award him additional pension benefits calculated as if he had remained employed until he was sixty-five.

Mohawk now appeals from the damages awarded by the jury.[2] Gibson cross-appeals from the district court's denial of his request for additional equitable relief.

## II.

## DISCUSSION.

### A. *Damages Issues.*

Mohawk first contends that the district court erred in permitting Gibson to recover damages from the date of his discharge to

the date of trial. The jury awarded Gibson $97,188.37 in actual damages for losses sustained over that period, plus the same amount in liquidated damages.

■ The purpose of the ADEA is to make persons whole for injuries suffered as a result of unlawful employment discrimination. *E.g., Brennan v. Ace Hardware Corp.,* 495 F.2d 368, 372–374 (8th Cir.1974). The Act provides legal and equitable remedies to eliminate the unlawful practices and to restore aggrieved persons to the position where they would have been if the illegal discrimination had not occurred. 29 U.S.C. § 626.

■ Consistent with the ADEA's purpose of recreating the circumstances that would have existed but for the illegal discrimination, aggrieved persons are not entitled to recover damages for the period beyond which they would have been terminated for a nondiscriminatory reason. *See e.g., Houghton v. McDonnell Douglas Corp.,* 627 F.2d 858, 863–866 (8th Cir.1980); *Cleverly v. Western Electric Co.,* 594 F.2d 638, 641–642 (8th Cir.1979). *See also Welch v. University of Texas,* 659 F.2d 531, 535 (5th Cir.1981) (Equal Employment Opportunity Act, 42 U.S.C. §§ 2000e *et seq.*).

Mohawk closed its West Helena plant on July 9, 1979, because of declining demand for its tires and high production costs at that facility. Gibson nonetheless argues that he is entitled to recover damages for his losses after July, 1979, up to the date of trial because had Mohawk not previously unlawfully discharged him, it would have transferred him to another position within the company after the West Helena closing.

Mohawk, on the other hand, argues that there is not substantial evidence in the record from which the jury reasonably could find that the company would have retained Gibson after the West Helena plant was closed. Thus, it claims the district court erred in failing to instruct the jury that Gibson's recovery must be limited to the

---

**2.** Mohawk does not challenge the jury's finding that it violated the ADEA by discharging Gibson.

time between his discharge and the closure of the West Helena plant, when Gibson would have been lawfully terminated. We cannot accept Mohawk's claim.

Gibson introduced evidence that he successfully performed his duties as general manager of the West Helena plant, and in several lesser positions in Mohawk's operations. He received numerous promotions, pay raises and merit bonuses throughout his twenty years with the company. Moreover, witnesses for Mohawk testified that the competition in the tire industry for well-qualified managerial personnel was intense.

At the time Mohawk closed its West Helena plant, it still operated numerous other facilities, including one new tire plant, three retread tire plants and several subsidiaries engaged in unrelated activities. In fact, Mohawk had transferred Gibson from West Helena to Salem, Virginia, in 1970 to help manage the construction of the company's new tire manufacturing facility and the training of the personnel for it. Witnesses for Gibson testified that he did an outstanding job, and that the Salem plant is now one of the most productive in the nation. The general manager's position still exists at the Salem facility, as well as the production manager's job which Gibson held while he was there. Moreover, several division manager positions, which Gibson formerly held on his way up the ranks in Mohawk, also apparently still exist at the Salem plant, as well as in Mohawk's other facilities. Gibson testified that to protect his pension, he would have accepted a position at another Mohawk facility that was lower than the one he held at West Helena.

Gibson also introduced evidence that Mohawk in the past had transferred its salaried personnel between its tire facilities. Indeed, Gibson testified that he was transferred between West Helena and Salem more than twice. Most importantly, there was also testimony that Mohawk transferred at least one salaried employee and offered transfers to several others upon the closing of the West Helena facility.

■ Based on the foregoing evidence, the jury reasonably could have found that Mohawk would have retained Gibson after it closed its West Helena facility. Thus, the district court did not err in refusing to limit Gibson's recovery as a matter of law to the period prior to the West Helena plant's closure.[3]

■ Mohawk alternatively contends that the district court's damage instruction was erroneous because it improperly directed the jury to award Gibson damages for all losses incurred up to the date of trial even though there was a question for the jury concerning whether Mohawk would have retained Gibson when it closed the West Helena plant. We agree.

> The district court instructed the jury that [i]f an interrogatory requires you to assess the damages of Mr. Gibson, you must then fix the amount of money which will reasonably and fairly compensate him for the value of the compensation by way of salary, together with specific monetary benefits, such as increased pension benefits, which plaintiff would have been entitled to had he remained employed by the defendant until the trial date.

We have already rejected Mohawk's contention that there was insufficient evidence to submit to the jury the issue of whether Gibson would have remained in Mohawk's employ after it closed the West Helena plant. Gibson concedes that the evidence was not sufficiently strong to mandate a finding that, as a matter of law, he would have been retained.

Thus, the parties' conflicting views created a question for the jury: Would Mohawk

---

3. Mohawk also claims that the district court erred in permitting Gibson to introduce evidence of the losses he suffered for the period after the West Helena plant was closed and his former job eliminated. Mohawk conceded that "the legal basis" for this challenge "is precisely the same as that set forth above with respect to the Jury Instructions." Accordingly, we reject this argument for the same reasons that we hold that the district court did not err in refusing to limit Gibson's recovery to the period between his unlawful termination and the closing of the West Helena plant.

have retained Gibson in some capacity after it closed the West Helena facility?[4] If so, Gibson would be entitled to recover any loss up to the time of trial that he could prove with sufficient certainty. If not, he could not recover damages for any period after the plant was closed and he would have been lawfully terminated. *See supra,* at 1097–1098.

The district court's damage instruction, however, effectively took this issue from the jury. It did not permit the jury to find that Gibson would not have been retained by Mohawk after it closed the plant and to deny him recovery for the period after the closing date. Instead, it directed the jurors to award Gibson damages for all losses suffered up to the date of trial if they found Mohawk liable for unlawful age discrimination—even if they believed that Gibson would have lost his employment with Mohawk when it closed the West Helena plant.

Moreover, the district court's decision that the jury could award Gibson monetary damages for losses incurred after the West Helena plant closed was inconsistent with its refusal in the equitable portion of the case to award Gibson reinstatement and a lump sum payment equal to the discounted present value of the difference between the pension to which he is now entitled and that which he would have received if he would have remained employed with Mohawk until he was sixty-five years old.[5] The court expressly based its denial of Gibson's request for this relief on its finding that "[a]s a matter of fact, the irrefutable evidence shows that even if Plaintiff had not been terminated in March, 1978, his job would have been eliminated subsequent to the plant closure in July, 1979." This finding cannot be reconciled with the district court's instruction to the jury to award Gibson damages up to the date of trial, which necessarily was premised on the assumption that Mohawk would have retained Gibson after it closed its West Helena plant.[6]

4. The district court recognized that this issue was one for the jury when it denied Mohawk's request to instruct the jury that it could not award any damages for losses sustained after July 9, 1979. The court expressly stated:

> I think its a question for the jury to determine whether or not the company could have been required to reinstate [Gibson] in one of the company's other plants. It could have been an issue, of course, there was not anything at the other plants, but testimony here, [Mohawk] had one other tire plant, [Mohawk] had three other tire tread plants and the company has other plants. * * * [I]t is a fact that should be determined by the jury, as to whether or not the company could have made a position available to him. Even though they closed this one down, they did do it for some others.

Inexplicably, however, the court subsequently contradicted this statement with its jury instructions, and equitable findings and remedy. *See infra,* at 1099.

5. The district court, however, ordered Mohawk to pay into Gibson's pension plan an amount of money equal to that which the company would have contributed from the date of Gibson's discharge until February, 1979, when Gibson reached age fifty-five. This equitable relief vested Gibson's pension one hundred percent and qualified him for the company's early retirement plan. Neither Mohawk nor Gibson objects on appeal to this relief and, thus, it is affirmed.

6. In *Cleverly v. Western Electric Co.,* 450 F.Supp. 507, 508–510 (W.D.Mo.1978), an age discrimination case similar to the one here, the jury awarded the plaintiff back pay up to the date of trial, September, 1976. In the equitable portion of the case, the district court retroactively reinstated the plaintiff through August, 1975, when he became eligible for his pension, but it declined to grant him actual reinstatement at the time it issued its order in April, 1978. *Id.* at 511. This Court found the "apparent inconsistency [between the awards of the jury and the district court] troublesome," but it upheld the district court's judgment. *Cleverly v. Western Electric Co.,* 594 F.2d 638, 641 (8th Cir.1979). We stated:

> The District Court did not specifically find, however, that Cleverly would not have been employed in any event as of the time of trial. Rather, the Court found that he would have been employed by Western Electric "at least" through August 1, 1975 when his pension rights vested, but was not entitled to reinstatement as of the time of the Court's order issued on April 14, 1978, because of "continued reduction in force by [Western Electric], for permissible business reasons, from the date of [Cleverly's] discharge *to the present.* [Emphasis included.] The court's conclusion that Cleverly would have been employed on August 1, 1975 but would not have been as of April 14, 1978, is not necessarily inconsistent with the jury's determination that he would

■ While Gibson does not challenge the district court's equitable findings because they are inconsistent with its damage instruction to the jury, he does contend that the court erred in denying his requests for additional equitable relief. Under the ADEA, the district court was vested with discretion to decide whether to award equitable relief. *See Loeb v. Textron, Inc.,* 600 F.2d 1003, 1021 (1st Cir.1979). On the record here, however, we cannot sustain its denial of Gibson's request for reinstatement and additional pension benefits. Although the court was correct in concluding that it was not free to award speculative benefits, it erred in basing its decision on its factual finding that Mohawk would have discharged Gibson when the West Helena plant was closed. As we noted above, the issue of whether Gibson would have remained in Mohawk's employ after July 9, 1979, was one for the jury—not the district court—to resolve. *See supra,* at 1098–1099.

■ Therefore, this matter must be remanded for a new determination of both the legal and equitable relief to which Gibson is entitled. In the new trial on the legal issues, the district court should first instruct the jury that Mohawk has already been found liable for unlawfully discharging Gibson in violation of the ADEA, and that the jurors must now determine the amount of damages to which Gibson is entitled. The district court must then allow the jury to determine the question of whether or not Mohawk would have retained Gibson as an employee in one of its operations after it closed the West Helena facility. Only then will the jury be able to determine the amount of money which will reasonably compensate Gibson for the wages and specific monetary benefits, such as pension benefits, that he would have received but for Mohawk's violation of the ADEA. The district court should clearly instruct the jury that it should award damages up to the time of the new trial on remand *only* if it finds that Gibson would have been retained by Mohawk in some capacity in any one of its operations after the West Helena plant closed. If Gibson would not have been transferred to another position at Mohawk when the West Helena plant was closed, he is only entitled to damages through July, 1979, when the company eliminated the general manager position for the West Helena facility.[7]

After the jury trial on the foregoing damages issues, the district court should reconsider Gibson's request for equitable relief. The equitable relief that the district court may grant includes, *inter alia,* additional pension benefits, reinstatement, and monetary damages in lieu of reinstatement. *See Goldberg v. Bama Manufacturing Corp.,* 302 F.2d 152, 156–157 (5th Cir.1962); *Hoffman v. Nissan Motor Corp. in the U.S.A.,* 511 F.Supp. 352, 357 (D.N.H.1981). *See generally Mitchell v. Robert DeMario*

---

have been employed as of September, 1976, but for his unlawful discharge. *Id.* at 641–642.

Contrary to Gibson's contentions, this Court's *Cleverly* decision does not support the district court's action here. In contrast to *Cleverly,* here the findings of the jury and of the district court in its equitable decree were "necessarily inconsistent." *Cf. id.* at 641. The jury's damage award assumes that but for its unlawful discrimination, Mohawk would have retained Gibson until the date of trial in 1981. The district court's decision in the equitable part of the case is premised on its finding that Gibson would not have been employed by Mohawk after July 9, 1979.

7. We believe that in an ADEA action, the plaintiff bears the ultimate burden of persuasion on damages issues. *See Douglas v. Anderson,* 656

F.2d 528, 530–531 (9th Cir.1981); *Cleverly v. Western Electric Co., supra,* 594 F.2d at 641. *See also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–256, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). The record before us in this case plainly shows that Gibson established a prima facie case of entitlement to damages for age discrimination from the date of his discharge until the date of trial. Mohawk then articulated a legitimate, nondiscriminatory reason—the closing of the West Helena plant—why Gibson is not entitled to recover damages for the period after July, 1979. On remand, Gibson will have the burden of proving that Mohawk would have transferred him to another position within its operations, or in other words, that the company's articulated reason for denying him damages for the period after July, 1979, is pretextual.

*Jewelry, Inc.,* 361 U.S. 288, 291–292, 80 S.Ct. 332, 334–35, 4 L.Ed.2d 323 (1960); *Loeb v. Textron, Inc., supra,* 600 F.2d at 1021–1023.[8]

In fashioning its equitable remedy, the district court is not free to reject the jury's findings on whether Mohawk would have retained Gibson when the West Helena plant closed, or on any other issues in this case. *See Cleverly v. Western Electric Co.,* 450 F.Supp. 507, 511 (W.D.Mo.1978), *aff'd,* 594 F.2d 638 (8th Cir.1979) ("[I]n the absence of exceptional circumstances * * *, the jury verdict in favor of plaintiff on the issue of age discrimination is *res judicata* for the purposes of the equitable claim for reinstatement."). Although the court below retains its discretion to consider all the circumstances in this case when it determines what equitable relief may be appropriate, it cannot base its decision on its own factual findings that conflict with those expressly made by the jury. *Cf. Cleverly v. Western Electric Co., supra,* 594 F.2d at 641–642; *Robb v. Chemetron Corp.,* 17 F.E.P. Cases 1535, 1545 (S.D.Tex.1978).

Accordingly, we vacate the district court's judgment awarding Gibson $97,-188.27 in actual damages and $97,188.27 in liquidated damages, and denying him reinstatement and additional pension benefits. This matter is remanded for further proceedings consistent with this opinion. We turn now to the remaining issues raised in this appeal.

B. *Other Issues.*

1. *Expert Witnesses.*

Mohawk contends that the district court erred in excluding expert testimony from two witnesses concerning the company's pension plan. Mohawk sought to have Richard Barney, from the Internal Revenue Service, and William Austin, from Prudential Insurance Company, testify about the nature of the company's pension plan and its liabilities thereunder.

We cannot agree that the district court abused its discretion. First, there is some question whether the district court in fact excluded any testimony. Witness Austin was permitted to testify concerning the vesting procedures of Mohawk's pension plan and its early retirement provisions. He also stated that under Mohawk's plan, Gibson's pension was, in fact, one hundred percent vested and that Gibson had been eligible for early retirement at age fifty-five. Mohawk did not attempt to call witness Barney, even though the district court indicated that he could testify for the limited purpose of discussing Gibson's insurance benefits.

Second, to the extent that the proffered testimony was excluded, it would have been largely cumulative evidence. Previous witnesses had testified that Gibson's pension was one hundred percent vested before he was terminated, that Gibson was eligible for early retirement prior to his discharge, and that Mohawk would not benefit financially by replacing Gibson with a younger general manager. Evidence was also introduced concerning Mohawk's method for funding its pension plan, and concerning the pension actually received by Gibson and that which he would have received if he had not been discharged.

The foregoing evidence was essentially the type of information that Mohawk hoped to elicit from Barney and Austin to rebut Gibson's charge that the company regularly discharged employees just before they reached retirement age in order to save money. Fed.R.Evid. 403 expressly permits testimony to be excluded if the district court concludes it would be a "needless presentation of cumulative evidence." Mohawk has failed to demonstrate that it was prejudiced by the exclusion of evidence that was not otherwise introduced at trial in at least a substantially similar form.

2. *Prejudgment Interest.*

Lastly, Gibson contends that the district court erred in refusing to grant him pre-

---

**8.** In determining whether to award equitable relief and, if so, what kind, a district court generally will assume, absent evidence to the contrary, that the illegally discharged employee would have continued working for the employer until he or she reached normal retirement age.

judgment interest on the damages awarded by the jury. We cannot agree.

[11] The ADEA does not indicate whether or not prejudgment interest may be awarded under the statute. The ADEA, however, is incorporated into the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 et seq. It is settled that the FLSA does not permit successful plaintiffs to obtain prejudgment interest in addition to liquidated damages because that would enable them to obtain double recovery. E.g., Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 715–716, 65 S.Ct. 895, 906, 89 L.Ed. 1296 (1945); Masters v. Maryland Management Co., 493 F.2d 1329, 1334 (4th Cir.1974). The Supreme Court explained this proscription against prejudgment interest in FLSA cases in Brooklyn Savings Bank v. O'Neil, supra, 324 U.S. at 715–716, 65 S.Ct. at 906:

> Allowance of interest on minimum wages and liquidated damages recoverable under § 16(b) tends to produce the undesirable result of allowing interest on interest. * * * Congress by enumerating the sums recoverable in an action under § 16(b) meant to preclude recovery of interest on minimum wages and liquidated damages. [Citations omitted.]

Gibson argues that these FLSA cases are inapplicable here because liquidated damages under the ADEA, unlike the FLSA, are intended to serve a punitive rather than compensatory purpose. In the 1978 amendments to the ADEA, however, the House Conference Report plainly indicated that liquidated damages pursuant to the ADEA in fact are compensatory in nature. It stated:

> The House recedes with an amendment which provides for a jury trial on any issue of fact in an action for recovery of amounts owing as a result of a violation of the ADEA. Under section 7(b) [of the ADEA], which incorporates the remedial scheme of sections 11(b), 16 and 17 of the

FLSA, "amounts owing" contemplates two elements: First, it includes items of pecuniary or economic loss such as wages, fringe, and other job-related benefits. Second, it includes liquidated damages (calculated as an amount equal to the pecuniary loss) which compensate the aggrieved party for nonpecuniary losses arising out of a willful violation of the ADEA.

H.Conf.Rep. No. 95–950, 95th Cong., 2d Sess. 13–14, reprinted in 1978 U.S.Code Cong. & Ad.News, 535. The report continued, explicitly stating:

> The ADEA as amended by this act does not provide remedies of a punitive nature. The conferees therefore agree to permit a jury trial on the factual issues underlying a claim for liquidated damages because the Supreme Court has made clear that an award of liquidated damages under the FLSA is not a penalty but rather is available in order to provide full compensatory relief for losses that are "too obscure and difficult of proof for estimate other than by liquidated damages" Overnight Transportation Company v. Missel, 316 U.S. 572, 583–84, 62 S.Ct. 1216, 1223, 86 L.Ed. 1682 (1942). [Footnote omitted and emphasis added.]

Id.

Thus, contrary to Gibson's contention, liquidated damages under the ADEA, like prejudgment interest, are intended to provide compensation for losses that cannot be calculated with certainty, such as the value attributable to the loss of use of unpaid wages after an employee has been unlawfully discharged. Accordingly, in order to prevent double recovery, successful plaintiffs are not entitled under the ADEA, as well as under the FLSA, to obtain both liquidated damages and prejudgment interest absent exceptional circumstances.[9] Accord Spagnuolo v. Whirlpool Corp., 641 F.2d 1109, 1114 (4th Cir.), cert.

---

9. We do not hold, however, that prejudgment interest may never be granted under the ADEA. Courts have ruled that the FLSA authorizes a grant of prejudgment interest if no liquidated damages are awarded, or if the liquidated damages given are less than the interest that would have been due from the date the claim for back pay accrued. E.g., McClanahan v. Mathews, 440 F.2d 320, 326 (6th Cir.1971). In such circumstances, prejudgment interest would be appropriate under the ADEA as well.

*denied,* 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981).

■ The court below therefore did not err in rejecting Gibson's claim that he, as a successful plaintiff under the ADEA, was entitled to $8,740.85 in prejudgment interest in addition to the $97,188.37 in liquidated damages he was awarded. We have vacated the jury's liquidated damages award for the reasons set forth above, however. On remand, Gibson might receive substantially less liquidated damages, or even none at all. The district court should consider any request on remand for prejudgment interest in light of the amount, if any, of liquidated damages awarded by the jury in the new damages trial. *See* note 9, *supra.*

### III.

### CONCLUSION.

For the foregoing reasons, we affirm the district court's judgment that Mohawk violated the ADEA by discharging Gibson, but vacate its damage award to him. We remand this matter for a new jury trial to determine the monetary damages to which Gibson is entitled, and for the district court to reconsider Gibson's request for additional equitable relief.